**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JERMERA BAYLOR,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Action No. BAH-21-3296** |
| **BEACON POINTE APARTMENTS, LLC,** | * | |
| **Defendant.** | * | |

**REPORT AND RECOMMENDATION**

On May 22, 2024, the Honorable Brendan A. Hurson referred this case to the undersigned to make recommendations concerning damages based on the Court's entry of a default judgment against Defendant Beacon Pointe Apartments, LLC (Beacon Pointe) pursuant to 28 U.S.C. § 636 and Local Rules 301 and 302 (D. Md. 2023).[1]  ECF Nos. 63, 70.  For the reasons set forth below, I respectfully recommend that the Court enter a damage award of $347,372.59 in favor of Ms. Baylor and against Beacon Pointe.

**I.    BACKGROUND**

**A.    Procedural History**

On November 12, 2021, Ms. Baylor filed suit in the Circuit Court for Baltimore County, Maryland, alleging a single count of negligence against Defendants Nathaniel Way, LLC (Nathaniel Way) and Eagle Rock Management, LLC (Eagle Rock) based on an occurrence at a rental apartment that resulted in injuries to Ms. Baylor.  ECF Nos. 1-1, 1-2, 4.  On December 28, 2021, Nathaniel Way and Eagle Rock removed the case to this Court on the basis of diversity

---

[1]  The form referral Order reflects that the case was referred to a United States Magistrate Judge for the purpose of "reviewing a default judgment and/or making recommendations concerning damages."  ECF No. 70.  The Court's Order entering default judgment against Beacon Pointe, however, makes clear that the case was referred to a United States Magistrate Judge solely for the purpose of recommending damages.  ECF Nos. 63, 70.

jurisdiction.  ECF No. 1.  On January 17, 2023, Ms. Baylor filed an Amended Complaint that added a single count of negligence against Beacon Pointe.  ECF No. 41.

On March 4, 2024, Ms. Baylor entered into a settlement agreement with Defendants Nathaniel Way and Eagle Rock.  ECF No. 80.  The three parties agreed that the terms of settlement would be confidential.[2]  *Id.* at 3–4.[3]  Their agreement includes a joint tortfeasors provision, which provides, in pertinent part, that all damages recoverable by Ms. Baylor against anyone other than Nathaniel Way and Eagle Rock based the claims asserted in this action are reduced by the greater of either (1) the amount of consideration paid for the settlement and release or (2) the statutory pro rata share of Nathaniel Way and Eagle Rock.[4]  *Id.* at 4.  The joint tortfeasor provision further provides for this purpose only Defendants Nathanial Way and Eagle Rock are considered joint tortfeasors with other tortfeasors liable to Ms. Baylor for damages based on the claims asserted in this action to the same extent as if they had been found to be joint tortfeasors by a final judgment of a court after a trial on the merits.  *Id.*  On April 26, 2024, Ms. Baylor, Nathaniel Way, and Eagle Rock filed a stipulation of dismissal with prejudice as to the claims against these two Defendants.  ECF No. 69.

As to the last Defendant, Ms. Baylor served Beacon Pointe a copy of the Amended Complaint, but it failed to file a responsive pleading within the proscribed period of time.  ECF No. 49.  Accordingly, Ms. Baylor moved for entry of a default judgment, which the Honorable

---

[2]  By the terms of the agreement, the confidentiality provision does not apply to, among other things, any disclosures that may be required by a court of competent jurisdiction.  ECF No. 80 at 3-4.

[3]  Page numbers refer to the pagination of the Court's Case Management/Electronic Case Files system (CM/ECF) printed at the top of the cited document.

[4]  Ms. Baylor also agreed to file a copy of the settlement agreement with the Court as evidence of her consent to have a judgment in her favor reduced pursuant to the joint tortfeasors provision.  ECF No. 80 at 4.

Richard D. Bennett granted on July 24, 2023.[5]  ECF Nos. 60–63.  The case was subsequently

reassigned to Judge Hurson, who referred the case to the undersigned for a recommendation

regarding the amount of damages to which Ms. Baylor is entitled from Beacon Pointe.  ECF Nos.

63, 77.  On October 10, 2024, the undersigned held an evidentiary hearing.  ECF No. 77.  In

preparation for that hearing, Ms. Baylor filed pre- and post-hearing briefs, documentary

evidence, and a motion to seal specified exhibits.[6]  ECF Nos. 75–76, 79, 81.  Beacon Pointe did

not appear at the evidentiary hearing or file any responsive pleadings before or afterwards.

### B.    Factual Background

Ms. Baylor's damage request is supported by affidavits, deposition transcripts, reports,

medical records, other documentary evidence, and testimony from Ms. Baylor, the pertinent parts

of which are summarized below.

### 1.    The Occurrence

On or about July 29, 2020, Ms. Baylor was hanging curtains in her new rental apartment.

ECF Nos. 41 ¶¶ 2, 7; 75-1 at 4.[7]  As Ms. Baylor "walked between her bed and her apartment

window her foot was trapped in a hole concealed by the carpet in the floor."  ECF No. 75-6 at

10; *see also id.* at 13.  "The concealed hole was located below the window and adjacent to the

existing floor vent along the exterior wall."  *Id.* at 11.  Ms. Baylor testified at the evidentiary

---

[5]  Multiple Court filings related to the entry of a default judgment and potential damages against Beacon Pointe all provided notice to Beacon Pointe.  ECF Nos. 51–53, 55, 60–63, 70–81.

[6]  On February 3, 2025, the undersigned granted in part and denied in part the motion to seal.  ECF No. 82.  Following issuance of that Order, Ms. Baylor refiled a portion of Exhibit 2 to her post-hearing brief as a publicly available document.  ECF No. 83.  Ms. Baylor elected not to withdraw the exhibits for which the motion to seal was denied.  Local Rule 105.11.

[7]  Ms. Baylor's apartment was located at 43 Loring Court, which "is an apartment unit in the larger Beacon Pointe Apartments and Townhomes" in Baltimore County, Maryland.  ECF No. 41 ¶ 2.  Nathaniel Way owns Beacon Pointe Apartments and Townhomes, which is one of seven properties Eagle Rock manages in Maryland.  ECF No. 75-6 at 13.

hearing that as she reached up on her "tippy toes" to hang a curtain in her new townhouse her foot sank into the ground. ECF No. 77. Ms. Baylor twisted her ankle severely and fell onto a table. *Id.* She was in "excruciating pain" and her ankle "instantly swelled up." *Id.* An engineer inspected Ms. Baylor's unit and concluded, among other things, that a hole had been cut into the subfloor and improperly reinstalled. ECF No. 75-6 at 15. Specifically, "a hole had been cut into the subfloor and was fastened only on one end" such that one side of the subfloor patch "was loose and lower than the subfloor by 2-inches." *Id.* at 15, 17; *see also id.* at 16 (containing pictures depicting the subfloor patch).

### 2. Medical Treatment

Documentary and testimonial evidence submitted in support of Ms. Baylor's damage request outlines that Ms. Baylor received a series of medical treatment following the occurrence. On the date of the occurrence, Ms. Baylor went to an urgent care center where she received x-rays and an ankle boot. ECF No. 75-1 at 4, 8. On August 7, 2020, Ms. Baylor was evaluated at an emergency department, where she had additional x-rays. *Id.* at 4, 8. Ms. Baylor returned to the emergency department on September 30, 2020, and thereafter she was treated at a variety of medical and pain care providers, including Ira Gubernick, M.D., an orthopedic surgeon, and Felix Gurman, M.D., the medical director of another medical center that treated Ms. Baylor. ECF Nos. 75-1 at 9–11; 75-4 at 7; 75-5 at 7.[8]

Dr. Gubernick testified at his deposition that he first evaluated Ms. Baylor on October 9, 2020, and that he treated her on approximately four other occasions. ECF No. 75-4 at 11. Ms. Baylor complained of pain in her right ankle. *Id.* at 23. Dr. Gubernick initially diagnosed Ms. Baylor with an ankle sprain and prescribed her an ankle brace, anti-inflammatory medicine, and

---

[8] Page number references for deposition testimony refer to the pagination of the deposition transcript as these filings (ECF Nos. 75–4 and 75-5) do not bear the Court's CM/ECF page numbers printed at the top of document beyond the first page of the filing.

physical therapy. *Id.* at 32–33, 53. At a follow-up visit on January 22, 2021, Ms. Baylor said that she had "difficulty walking on her leg" and "described a tingling, burning sensation [in] her medial arch and her ankle." *Id.* at 59. Ms. Baylor was "using a crutch" and described her "[n]umeric pain score for pain assessment [as] three" out of ten. *Id.* at 60. Dr. Gubernick became concerned that Ms. Baylor wight have Complex Regional Pain Syndrome in her right lower limb and referred her to a pain management specialist. *Id.* at 58, 60, 62–63, 73. When Dr. Gubernick saw Ms. Baylor on June 18, 2021, she described her numeric pain score as a ten out of ten. *Id.* at 70. Dr. Gubernick again referred Ms. Baylor to a pain management specialist. *Id.* at 70–71.

Dr. Gurman testified at his deposition that Dr. Gubernick had referred Ms. Baylor to him to be evaluated for possible Chronic Regional Pain Syndrome. ECF No. 75-5 at 24–25. Dr. Gurman did not remember Ms. Baylor specifically. *Id.* at 29. He saw Ms. Baylor once on February 8, 2021, and then she was seen by a nurse practitioner in his office two more times after that. *Id.* at 5, 20–21. Dr. Gurman explained that Chronic Regional Pain Syndrome is "a very rare and complicated condition" that occurs when the "sympathetic nervous system goes haywire," which can result in "pain, swelling, change of color, skin changes, nail changes, hair changes, et cetera." *Id.* at 96–97. It is "a diagnosis of exclusion," meaning that he would "want to make sure there's no other obvious . . . cause [for] that pain," such as a sprained ankle, stress or compound fracture, neuropathies, or vascular issues. *Id.* at 24–26. Dr. Gurman wrote in his notes of the visit that Ms. Baylor did "not show the severe pathology to explain her symptoms" or, in other words, there was "nothing that's severe enough to explain [ ] her pain." *Id.* at 25. According to Dr. Gurman, Chronic Regional Pain Syndrome is "a very difficult diagnosis" that is based on a series of factors called "the Budapest Criteria," some of which examine subjective responses to stimuli and some of which develop over time. *Id.* at 28, 32–33, 36–39.

Dr. Gurman's application of the Budapest Criteria to Ms. Baylor's presentation led him to diagnose her as having Chronic Regional Pain Syndrome.  *Id.* at 100.  Among other things, the clinical notes of Dr. Gurman and the nurse practitioner reflect that Ms. Baylor described her numeric pain score as ranging between seven and ten out of ten.  *Id.* at 50, 52–54.  The clinical notes further reflect that the nurse practitioner discussed some procedures to help treat Ms. Baylor, including "sympathetic block and a stimulator trial," and the Ms. Baylor was going to discuss it with her mother and decide whether or not to move forward.  *Id.* at 91.

Ms. Baylor retained Joshua Macht, M.D., to provide expert testimony regarding damages. ECF No. 75-1 at 2.  Dr. Macht examined Ms. Baylor on August 7, 2024, and reviewed her medical records.  *Id.* at 2, 4; *see generally* ECF No. 75-1.  At the time of his examination, Ms. Baylor continued with monthly pain management visits and prescription pain medicine.  *Id.* at 4. She reported to Dr. Macht that she was "still discussing proceeding with lumbar sympathetic block procedures."  *Id.*  She also described experiencing "daily pain involving the right foot and ankle ranging from moderate to severe in intensity"; "intermittent numbness and tingling throughout the entire foot and ankle area"; "intermittent swelling and . . . purplish discoloration of the skin"; and "intermittent allodynia about the foot and ankle."[9]  *Id.*  Ms. Baylor reported "diminished endurance for standing, walking, stair-climbing, and squatting" and "difficulty with household cleaning tasks at times."  *Id.*  Ms. Baylor reported that she stopped driving and continued to use "an ankle brace and a single crutch at times."  *Id.* at 5.  Dr. Macht observed that Ms. Baylor had a mild antalgic gait that favored her right leg and a diminished range of motion

---

[9]  Allodynia is "pain resulting from a stimulus (such as a light touch of the skin) which would not normally provoke pain."  *Allodynia*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/allodynia (last visited Feb. 11, 2025).

of her right toes and ankle.[10]  *Id.*  Dr. Macht diagnosed Ms. Baylor as having "[t]raumatic injury to right foot and ankle with chronic pain syndrome."  *Id.*

Dr. Macht opined that Ms. Baylor "underwent an appropriate course of initial medical evaluation," and subsequently "underwent treatment with physical therapy, orthopedic, and pain management care."  *Id.*  Dr. Macht further opined that Ms. Baylor would benefit from ongoing pain maintenance care.  *Id.* at 6.  Following the evidentiary hearing, Dr. Macht attested that "Ms. Baylor's condition is chronic[,] and it is reasonably probable and certain that she will continue to experience her current symptoms into the future."  ECF No. 83-1 at 2.  He further attested that "it is reasonably probable and certain she will remain in long term pain management as a sole result" of the occurrence, and that "[s]uch future care is reasonable and necessary[ ] and will remain so."  *Id.*

Ms. Baylor testified at the evidentiary hearing that she continues with pain management. ECF No. 77.  She has an appointment with Clearway Pain Solutions every four weeks and uses prescription pain medication.  *Id.*  Although she initially thought the recommended palliative lumbar sympathetic nerve blocks were risky, she testified that she is willing to try them now, but her insurance will not cover the cost of the procedure.  *Id.*

3.    Ms. Baylor's Employment History and Future Employment

Ms. Baylor testified that at the time of the occurrence she was 20 years old and worked full time at Royal Farms.  ECF No. 77; *see also* ECF No. 75-2 (noting that Ms. Baylor had previously worked as a cashier, security guard, vehicle loader, and stocker).  She further testified that after the occurrence, she was unable to work for "almost a year."  ECF No. 77.  Following

---

[10]  Antalgic is "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)."  *Antalgic*, Merriam-Webster.com Medical Dictionary, Merriam-Webster, https://www.merriam-webster.com/medical/antalgic (last visited Feb. 11, 2025).

the occurrence, Ms. Baylor secured a few positions, but she did not work at any position for very long for a variety of reasons. *Id.* Ms. Baylor testified that she has consistently looked for work, other than when she was pregnant and caring for her new baby (from approximately September 2022 through December 2023). *Id.* Ms. Baylor elected to care for her child full time for the first eleven months of her child's life and did not seek employment during that timeframe. *Id.* Ms. Baylor further testified that she obtained her phlebotomist certificate while she was pregnant. *Id.* She stated that she would like to obtain a position as a phlebotomist; she is not interested in becoming a veterinarian technician. *Id.*

Following the evidentiary hearing, Ms. Baylor filed an affidavit that sets forth her employment history at the time of and following the occurrence. ECF No. 79-1. In this affidavit, Ms. Baylor attested that from April 2020 until the time of the occurrence, she was employed full time by Royal Farms and earned $11.00/hour. *Id.* at 2. As a result of the occurrence, Ms. Baylor could not return to work. *Id.* Ms. Baylor also filed a report from MedStar Health in which it was documented that she was unable to work from July 29, 2020, to January 25, 2021. *Id.* at 5. Ms. Baylor further attested that she worked for PetSmart in May 2021, but the employer was "unable to honor [her] restrictions." *Id.* at 2. She earned $707 at this job. *Id.* Ms. worked for Amazon, earning $2,671, and for Charles River Labs, earning $8,459. *Id.* Ms. Baylor left Amazon because it "could no longer honor [her] limitations," and separated from Charles River Labs in November 2022 due to her pregnancy. *Id.* Ms. Baylor attested that did not work in 2023. *Id.* She obtained her phlebotomist certification in July 2023 and has "used good faith efforts to obtain work in this field." *Id.* at 3. In May 2024, Ms. Baylor worked at Starbucks for two weeks and earned approximately $600. *Id.*

Ms. Baylor also filed income tax records, which reveal that after the occurrence her wages initially decreased but increased in subsequent years.[11]  ECF No. 79-1 at 7–34.  Ms. Baylor's wages for the years before and after the July 29, 2020 occurrence were as follows: 2019 ($5,197); 2020 ($3,875); 2021 ($707); 2022 ($13,902); 2023 ($5,418).

With regard to future employment, Dr. Macht opined that Ms. Baylor "is permanently and totally disabled from working beyond a sedentary to light duty capacity."  ECF No. 75-1 at 7.  James Sullivan, a certified vocation evaluator retained by Ms. Baylor, prepared a vocational evaluation report dated May 27, 2022, based on his review of medical and physical therapy notes and his interview of Ms. Baylor.[12]  ECF No. 75-2 at 4–9.  Mr. Sullivan noted in his report that Ms. Baylor "is limited to Sedentary Duty work, at best."  ECF No. 75-2 at 1, 4.

In 2022, Mr. Sullivan concluded that it was "very probable" that Ms. Baylor would have pursued a career as a veterinary technician "based on her volunteer work, dog groomer experience, and overall interest in working with animals."  *Id.* at 7.  Mr. Sullivan further noted that a veterinary technician, a position that is a medium duty occupation, which Ms. Baylor is unable to do.  *Id.* at 6.  Mr. Sullivan's report then analyzed the salary and local labor market for veterinary technicians and projected Ms. Baylor's likely future earnings as a veterinary technician.  *Id.* at 7.  Ms. Baylor also retained Thomas Borzilleri, Ph.D., an economist, who prepared a report regarding the Ms. Baylor's lost earning capacity.  ECF No. 75-3 at 2–28.  This report calculates the present value of Ms. Baylor's lost earning capacity as ranging between

---

[11]  These records consist of Internal Revenue Service Wage and Income Transcripts, which detail Ms. Baylor's annual earnings reported on Form W-2 Wage and Tax Statements and Form 1099-G.

[12]  At a later point in time Mr. Sullivan certified that the report had been updated, although the date on which this occurred in unclear.  ECF No. 75-2 at 9.  On September 6, 2024, Mr. Sullivan attested to the truth and accuracy of his report.  *Id.* at 2–3.

$1,689,530 to $2,222,306.  *Id.* at 5.  These calculations are based, in part, on Mr. Sullivan's report.  *Id.* at 6.

4.    <u>Other Effects of the Occurrence</u>

Ms. Baylor testified at the evidentiary hearing that before the occurrence, she never had an injury that affected her mobility.  ECF No. 77.  She was very active, working and hiking approximately three times a week.  *Id.*  As a result of the occurrence, she can no longer drive, cook, stand in the shower, walk her dog, or hold her child while she walks upstairs.  *Id.*  Ms. Baylor testified that a typical day is "miserable."  *Id.*  Ms. Baylor described how her limited mobility has negatively impacted her ability to help around the house, work outside the home, and engage in social activities.  *Id.*  When she leaves the house, she uses either a "boot" or crutches.  *Id.*  Ms. Baylor further described how every day her ankle is sore; sometimes she experiences tingling and numbness and other times it feels like she is walking on glass and nails. *Id.*  At the evidentiary hearing, Ms. Baylor displayed her right ankle, which appeared discolored and swollen, and testified regarding the range of affects she continues to experience because of the occurrence.  *Id.*  She stated that her toes on the right foot are a different color and more sensitive to touch; that she has a decreased range of motion; and that the sensation in her right foot ranges from feeling like her foot is asleep, hot to the touch, and like she is "walking on nails," which causes her to fall to the ground.  *Id.*

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 55 governs entries of default and default judgments. "Although the United States Court of Appeals for the Fourth Circuit has a strong policy that cases be decided on the merits, default judgment is appropriate when the adversary process has been halted because of an essentially unresponsive party."  *Entrepreneur Media, Inc.* v. *JMD Ent. Grp., LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013) (internal quotation marks and citations

omitted).  Accordingly, Rule 55 provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  When the party's claim is not for "a sum certain" or "a sum that can be made certain by computation," the party must apply to the court for a default judgment."  Fed. R. Civ. P. 55(b).

When deciding a motion for default judgment, "the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."  *Securities & Exch. Comm'n* v. *Lawbaugh*, 359 F. Supp. 2d 418, 422 (D. Md. 2005).  With respect to liability, the Court must consider whether the well-pled allegations state a plausible claim.  *Frozen Wheels, LLC,* v. *Potomac Valley Home Med., Inc.*, Civil Action No. CCB-20-2479, 2024 WL 1132092, at *3 (D. Md. Mar. 15, 2024) (Coulson, J.) (noting that "the Court must consider whether the unchallenged facts constitute a legitimate cause of action because a party in default does not admit mere conclusions of law"); *Select Specialty Hosp. - Quad Cities, Inc.* v. *WH Administrators, Inc.*, Civil Action No. PX-18-03586, 2020 WL 4569521, at *3 (D. Md. Aug. 7, 2020) (observing that "the pleading standards announced in *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007), [apply] in the context of default judgments").

If the Court determines that the well-pled allegations are sufficient to establish liability, it must then determine the appropriate amount of damages or other relief.  *Frozen Wheels, LLC*, 2024 WL 1132092, at *3; *Entrepreneur Media, Inc.*, 958 F. Supp. 2d at 593.  Rule 54 provides that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).  Damages are therefore "circumscribed by that which is requested in the complaint."  *Select Specialty Hosp. - Quad Cities, Inc.*, 2020 WL 4569521, at *3.  When assessing damages or other relief, the Court cannot accept as true the well-pled

allegations but must instead make an independent determination that is "supported by evidence introduced either at a hearing or by affidavit or other records." *Id.*; *Entrepreneur Media, Inc.*, 958 F. Supp. 2d at 593; *see also Frozen Wheels, LLC*, 2024 WL 1132092, at *3 ("A plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence."). When evaluating damages, the Court may "conduct hearings or make referrals," Fed. R. Civ. P. 55(b)(2), although an evidentiary hearing is not required in every circumstance, *Monge* v. *Portofino Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010) (collecting cases).

"The fundamental goal of tort recovery is compensation of the injured party." *Ramrattan* v. *Burger King Corp.*, 656 F. Supp. 522, 524 (D. Md. 1987). Accordingly, an award of damages "should place the victim, insofar as money may do so, in the position she would have occupied absent the tort." *Id.* Here, because "the negligent acts which give rise to the liability herein occurred in Maryland, the law of Maryland governs the elements and measure of damages to be awarded." *Burke* v. *United States*, 605 F. Supp. 981, 987 (D. Md. 1985). By Maryland statute, "economic damages" in a personal injury action are defined as "loss of earnings and medical expenses," which include past and future medical expenses and past and future loss of earnings. Md. Code Ann., Cts. & Jud. Proc. § 11-109(a)(1), (b). "Noneconomic damages" in a personal injury action are defined as encompassing, among other things, "pain, suffering, inconvenience, physical impairment, . . . or other nonpecuniary injury." Md. Code Ann., Cts. & Jud. Proc. § 11-108(a)(2)(i)(1).

Under Maryland law, a plaintiff has the "burden to prove damages with a reasonable amount of certainty." *Lewin Realty III, Inc.* v. *Brooks*, 138 Md. App. 244, 295 (2001), *aff'd*, 378 Md. 70 (2003), and *abrogated on other grounds* by *Ruffin Hotel Corp. of Maryland* v. *Gasper*, 418 Md. 594 (2011). In other words, "an award for compensatory damages must be anchored to

a rational basis on which to ensure that the awards are not merely speculative." *AXE Props. & Mgmt., LLC* v. *Merriman*, 261 Md. App. 1, 46 (2024). "In Maryland, recovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain. Such damages cannot be recovered if future consequences are 'mere possibilities.'" *Pierce* v. *Johns-Manville Sales Corp.*, 296 Md. 656, 666 (1983). "Reasonable '[p]robability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur).'" *Jacobs* v. *Flynn*, 131 Md. App. 342, 355 (2000) (quoting *Cooper* v. *Hartman*, 311 Md. 259, 270 (1987)) (alteration in original); *see also High* v. *United States*, Civil Action No. PX 16-2915, 2018 WL 805392, at *1 (D. Md. Feb. 8, 2018) (applying Maryland law and utilizing the preponderance of the evidence standard for damages). The amount of damages, however, does not need to "be proven to a *mathematical* certainty." *Brock Bridge Ltd. P'ship, Inc.* v. *Dev. Facilitators, Inc.*, 114 Md. App. 144, 157 (1997) (emphasis in original); *see also Lopez* v. *Lawns 'R' Us*, Civil Action No. DKC 07-2979, 2008 WL 2227353, at *3 (D. Md. May 23, 2008) (Schulze, J.), *report and recommendation adopted sub nom.*, 2008 WL 11509751 (D. Md. June 26, 2008) ("The Court may award damages based on Plaintiffs' testimony even though the amounts claimed are only approximated and not perfectly accurate.").

## III.    DISCUSSION

The Court entered a default judgment against Beacon Pointe on July 24, 2023, which has gone unchallenged. ECF No. 63. The remaining issue, and the impetus for this referral, is the determination of the amount of damages to which Ms. Baylor is entitled from Beacon Pointe. Ms. Baylor seeks five categories of damages: (1) past medical expenses; (2) future medical expenses; (3) past lost wages; (4) future lost earnings; and (5) non-economic damages, each of which is addressed in turn below.

A.    Past Medical Expenses

Maryland law permits a plaintiff is entitled to recover "the reasonable value of all damages caused by a defendant's wrongful conduct, including damages for past medical care." *Lawson* v. *United States*, 454 F. Supp. 2d 373, 417 (D. Md. 2006) (citing *Walston* v. *Dobbins*, 10 Md. App. 490, 496-497 (1970)). "As a general rule, it does not matter if those health care services were initially financed by someone other than the victim – for example, the victim's health care insurance, other insurance, or a relative." *Westfield Ins. Co.* v. *Gilliam*, 477 Md. 346, 353 (2022) (internal citations omitted). Regardless, the "tortfeasor remains responsible for paying the victim the 'fair and reasonable' value of the health care services that the victim needed as a result of the tort." *Id.* (internal citations omitted). As the Supreme Court of Maryland has observed, "[d]etermining the fair and reasonable value of health care services is not easy" because the "fair and reasonable value of health care services can be quite distinct from the amounts billed by health care providers or the amounts actually paid to the providers by the tort victim or other payor."[13] *Id.* at 353-354.

On their face, the medical billing records filed in this case raise the question of what is the fair and reasonable value of Ms. Baylor's past medical expenses. A review of the records from Advanced Pain Management Specialists, LLC for dates of service between October 1, 2023, and September 30, 2024, reflect that a significant portion of the original charges was adjusted. *Id.* at 5–16. For example, of the $600 charged for the October 11, 2023 date of service, $461.39 was adjusted and only $138.61 was paid. *Id.* at 8. After accounting for all adjustments, only $2,904.86 was paid to the medical provider, which is approximately 25% of

---

[13]  Effective December 14, 2022, the name of Maryland's highest court was changed from the "Maryland Court of Appeals" to the "Supreme Court of Maryland." *Middleton* v. *Koushall*, Civil Action No. ELH-20-3536, 2024 WL 1967816, at *21 n.16 (D. Md. May 3, 2024). The Court's current name is used throughout this opinion.

the total amount billed ($11,455) during the analyzed timeframe.  *Id.* at 5–16.  The adjustments

call into question whether the original charges were fair and reasonable.  Maryland courts have

cautioned, however, that "the mere acceptance by a medical provider of the payment of a lesser

amount on a bill is not probative of the reasonable value of the medical services reflected in that

bill."  *Brethren Mut. Ins. Co.* v. *Suchoza*, 212 Md. App. 43, 56 (2013).  The reality is that there

"are many reasons (*e.g.,* managed care contracts, Medicaid contracts, private insurance

agreements, etc.) why medical providers would accept a lesser amount than the amount

charged."  *Id.*  As the Supreme Court of Maryland has explained, "[t]he complexities of health

care pricing structures make it difficult to determine whether the amount paid, the amount billed,

or an amount in between represents the reasonable value of medical services."  *Westfield Ins.

Co.*, 477 Md. at 354.

    Despite this challenge—or perhaps because of it—when assessing past medical expenses

under Maryland law the touchstone remains the "fair and reasonable" value of the medical

care.[14]  *E.g.*, *Browne* v. *State Farm Mut. Auto. Ins. Co.*, 258 Md. App. 452, 504 (2023)

(observing that Maryland cases focus on the reasonableness in amount of medical bills)

(collecting cases).  Medical bills alone are insufficient to satisfy this requirement.  *Kujawa* v.

*Baltimore Transit Co.*, 224 Md. 195, 208, (1961) ("Evidence of the amount or payment of

medical bills does not establish the reasonable value of the services for which the bills were

rendered or justify recovery therefor."); *Thomas* v. *Owens*, 28 Md. App. 442, 445 (1975) ("In

Maryland, before a medical bill can be admitted to prove the reasonableness of the amount

charged, there must be other evidence that the charge set forth in the bill was reasonable.").

Instead, the proponent of medical billing records must provide "expert testimony or other

---

[14]  By statute, Maryland restricts damage awards for medical malpractice claims to the
total amount paid or incurred.  Md. Code Ann., Cts. & Jud. Proc. § 3-2A-09(d)(1).  Given that
this action involves an ordinary negligence claim, this statute is not implicated.

competent evidence to establish the fairness and reasonableness of such payments." *Brethren Mut. Ins. Co.*, 212 Md. App. at 57.

Here, Ms. Baylor initially sought $10,787.67 in past medical expenses.  ECF No. 75 at 2. In support of this request, Ms. Baylor filed spreadsheet from The Rawlings Company that outlines the treatment she received from July 29, 2020, through January 31, 2024.[15]  ECF No. 75-1 at 8–11.  The total amount billed for all the medical treatment itemized on this spreadsheet is $9,819.20.[16]  *Id.* at 11.  Following the evidentiary hearing, Ms. Baylor supplemented her filings and amended her request to a total of $18,816.20.  ECF No. 79 at 2.  Among other things, Ms. Baylor filed a spreadsheet from Advanced Pain Management Specialists, LLC that details billing for Ms. Baylor's medical treatment from February 8, 2021, through September 16, 2024. ECF No. 79-2 at 5–16.  A review of this spreadsheet reveals that ten of the listed charges duplicate billing charges outlined in The Rawlings Company spreadsheet.  After deducting these duplicate charges, the total amount billed for all medical treatment itemized on the Advanced Pain Management Specialists, LLC spreadsheet is $8,735.  The combined total of the amounts billed on the two spreadsheets is $18,554.20.

Ms. Baylor supported her past medical expenses request with affidavits and reports from Dr. Macht.  ECF Nos. 75-1, 83-1.  Dr. Macht opined that the care outlined in the medical records he reviewed was "fair, reasonable, necessary, and causally connected to the July 29, 2020 accident."  ECF No. 75-1 at 5.  Dr. Macht also reviewed Ms. Baylor's billing records related to

---

[15]  At the evidentiary hearing, Ms. Baylor's counsel represented that Ms. Baylor is a Medicaid beneficiary and The Rawlings Company administers Medicaid payments.  ECF No. 77.

[16]  Counsel for Ms. Baylor stated at the evidentiary hearing that because the spreadsheet included only treatment through January 31, 2024, he converted the itemized expenses to a monthly amount and extrapolated to bring the amount current to the time of his submission on behalf of Ms. Baylor, which he calculated to be $10,787.67.  ECF No. 77.  I recommend that the Court find that counsel's calculations unsupported by competent evidence are an insufficient basis to support a damage award above what is outlined in the documentary evidence.

the medical care she received as a result of the occurrence.  *Id.* at 6.  He attested that the medical

billing was "fair, reasonable and customary for this area for the medical services rendered," and

"causally related to the July 29, 2020 accident."  *Id.*  Following the evidentiary hearing, Ms.

Baylor filed a supplemental affidavit in which Dr. Macht attested, among other things, that he

reviewed the medical billing records from Advanced Pain Management Specialist for the one-

year period of October 1, 2023, to September 30, 2024, during which time Ms. Baylor incurred

$11,455 in medical charges and services.  ECF No. 83-1 at 2.  Dr. Macht opined that these

charges are "fair, reasonable, customary and usual for this geographic area" during the relevant

timeframe.  *Id.* at 3.  Analysis of the relevant medical billing records reveals that the amount of

medical charges Dr. Macht referred to reflect the total amount billed, not the adjusted billing

amount.  *Id.* at 8–16.  Based on the medical billing records and Dr. Macht's affidavits, I

recommend that Ms. Baylor be awarded $18,554.20 for past medical expenses.

### B.    Future Medical Expenses

Under Maryland law, damages for future medical care "are recoverable if it is more likely

than not that the expense will be incurred."  *Lawson*, 454 F. Supp. 2d at 417; *see also*

*Muenstermann by Muenstermann* v. *United States*, 787 F. Supp. 499, 522 (D. Md. 1992) (citing

federal and Maryland cases).  Maryland courts "apply th[e] present valuation rule to damages for

loss of future benefits in personal injury actions."  *Lewin Realty III, Inc.* 138 Md. App. at 289

(discussing cases).

Here, Ms. Baylor seeks $505,180 in future medical expenses.  ECF No. 79 at 2.  Dr.

Macht attested in his supplemental affidavit that because "Ms. Baylor's condition is chronic . . .

it is reasonably probable and certain that she will remain in long term pain management as a sole

result" of the occurrence.  ECF No. 83-1 at 2.  Dr. Macht further attested that Ms. Baylor's future

medical needs include "monthly visits, screening and diagnostic testing, and medication

management." *Id.* Dr. Macht reviewed medical billing from Advanced Pain Management Specialists LLC from October 1, 2023, through September 30, 2024, which totaled $11,455, and opined that such charges were "fair, reasonable, customary and usual for this geographic area" during the relevant timeframe. *Id.* at 2–3. Ms. Baylor also retained Joe Rosenberg, C.F.A., M.B.A., and M.A., as a damages expert. ECF No. 79-4. Mr. Rosenberg prepared an economic loss report in which he opined that Ms. Baylor's future medical expenses discounted to present value are $505,180. *Id.* at 4–9.

Although the depositions and reports of medical professionals indicate that Ms. Baylor initially declined to pursue the recommended palliative lumbar sympathetic nerve blocks, *see supra* I.B.2., Ms. Baylor credibly testified at the evidentiary hearing that she is now interested in pursuing that course of treatment because nothing else has provided effective relief, ECF No. 77. She further testified that she has not yet pursued that treatment because her insurance does not cover it. *Id.* The only evidence of the future cost of this treatment is Dr. Macht's initial affidavit in which he attested that the cost would be $2,000 per procedure. ECF No. 75-1 at 7. This evidence is insufficient to determine the future cost of such treatment or what the cost would be when discounted to present value. I therefore recommend that Ms. Baylor be awarded $505,180 for future medical expenses, which is the amount of her current treatment regimen discounted to present value.

### C.    Past Lost Wages

"As with other items of damage, plaintiff must show that the loss of earnings was attributable to those injuries sustained due to defendant's wrongful conduct. Other motivations for discontinuing employment, such as a desire to devote time to other pursuits, are obviously insufficient to support an award for lost earnings." *Burke* v. *United States*, 605 F. Supp. 981, 998 (D. Md. 1985) (citing Damages in Tort Actions, supra, § 10.13 at 10–13).

Here, Ms. Baylor seeks $28,910 in past lost wages, which is based on the amount of her earnings from her full-time job at the time of the occurrence where she was paid $11.00 per hour. ECF No. 79.  Ms. Baylor calculates that she is entitled to $11,440 for the 26 weeks (July 29, 2020, to January 25, 2021) immediately following the occurrence when medical professionals opined that she was unable to work.  ECF Nos. 79 at 2, 79-1 at 5.  Ms. Baylor calculates that she is also entitled to $28,910 for the 91 weeks of pay (January 26, 2021, to November 1, 2022) minus the amounts she earned from other employment.  ECF No. 79 at 2–3.  These dates reflect the period when Ms. Baylor was medically authorized to return to work through when she left her employment at Charles River Labs due to her pregnancy.[17]  ECF No. 79-1 at 2.  As noted, *see supra* I.B.3, Ms. Baylor elected to care for her child full-time for eleven months after she gave birth.  ECF No. 77.

Ms. Baylor past lost wage request is supported by her affidavit in which she attests to her rate of pay at Royal Farms and dates of employment, as well as documentation from MedStar that states that Ms. Baylor was "unable to return to work from 7/29/2020 to 01/25/2021."  ECF No. 79-1 at 5.  This evidence causally connects Ms. Baylor's loss of wages to the occurrence, outlines the amounts she would have earned, and properly excludes intermittent periods of employment and periods when Ms. Baylor had other motivations for discontinuing employment. I therefore recommend that the Court award Ms. Baylor $28,910 in lost wages.

### D.    Future Lost Earnings

"In personal injury cases courts generally, and Maryland particularly, consider among other losses, lost wages and earnings suffered by the injured person not only from the time of

---

[17]    At the evidentiary hearing, Ms. Baylor estimated that she had left her employment with Charles River Labs in September 2022.  ECF No. 77.  She subsequently filed an affidavit in which she attested that she separated from this job in November 2022.  ECF No. 79-1 at 2. Given that the affidavit contains more specific dates and amounts that Ms. Baylor provided in her testimony, the undersigned credits the dates reflected in Ms. Baylor's affidavit.

injury to the trial, but those reasonably certain to occur in the future." *Lumber Terminals, Inc.* v. *Nowakowski*, 36 Md. App. 82, 89 (1977). "Maryland courts have held that, although loss of future earnings and earnings capacity may be recoverable in tort, '[f]uture damages must be established with reasonable certainty, and must not rest upon speculation or conjecture.'" *Derosier* v. *USPLabs, LLC*, Civil Action No. CCB-10-2559, 2011 WL 5825990, at *4 (D. Md. Nov. 17, 2011) (quoting *Lewin Realty III, Inc.*, 138 Md. App. at 279) (alteration in original). As with future medical expenses, "in a personal injury action . . . any damages awarded for loss of future earning capacity must be reduced to present value." *Burke*, 605 F. Supp. at 990 (citing *Dennis* v. *Blanchfield*, 48 Md. App. 325, 333 (1981), *modified on other grounds sub nom.*, 292 Md. 319 (1982)).

Ms. Baylor seeks an award of future lost wages that ranges from $1,689,530 to $2,222,306. ECF No. 75. In support of this award, Ms. Baylor relies on her initial submission, which she elected not to supplement. ECF No. 79 at 3. Her initial submission, however, does not support an award of lost future wages or earning capacity. First, as a factual matter it does not appear that Ms. Baylor has experienced a reduction in her earning capacity. Ms. Baylor's income tax records reflect that in 2022 she earned more than twice what she earned in 2019 and in 2023 (the year in which she testified and attested that she did not work) her earnings were roughly equivalent to her 2019 earnings. ECF Nos. 77; 79-1 at 2, 11–19, 29–34.

Second, the evidence in support of a future lost earning damage award is premised on speculation. In his 2022 vocational evaluation report, Mr. Sullivan concluded that it was "very probable" that Ms. Baylor would have pursued a career as a veterinary technician. ECF No. 7. This conclusion was based solely on Ms. Baylor's limited work experience as a dog groomer, her stated interest in working with animals, and the fact that she has a dog and a cat and "explored" a 16-week class at a community college (in which she did not enroll). ECF No. 75-2 at 6–7.

20

Rather than a "reasonable probability," this conclusion is better characterized as a "mere possibility." *Jacobs*, 131 Md. App. at 355; *Pierce* 296 Md. at 666. Indeed, Ms. Baylor testified at the evidentiary hearing that she is not interested in becoming a veterinarian technician and since she met with Mr. Sullivan, she has obtained a certification to work as a phlebotomist and wishes to find employment in this field. ECF No. 77; *see also* ECF No. 75-1 at 1. Mr. Sullivan's salary and labor market analysis—and Dr. Borzilleri's corresponding economic calculations— are therefore lacking the requisite factual basis. I recommend that the Court deny this component of Ms. Baylor's damage request.

### E.    Noneconomic Damages

"Maryland permits 'recovery of damages for emotional distress if there was at least a consequential physical injury,' in the sense that 'the injury for which recovery is sought is capable of objective determination.'" *Fields* v. *Walpole*, Civil Action No. DKC 11-1000, 2013 WL 2154798, at *3 (D. Md. May 16, 2013) (quoting *Hoffman* v. *Stamper*, 385 Md. 1, 34 (2005)). "This physical manifestation requirement allows recovery for such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs, but does not permit recovery based on the plaintiff simply saying, 'This made me feel bad; this upset me.'" *Fields*, 2013 WL 2154798, at *3 (internal quotation marks and citations omitted). This category of damages encompasses "physical pain and suffering," "mental and emotional suffering and anxiety [experienced] as a result of the injuries," and the loss of the "capacity to enjoy the usual and familiar tasks of life." *Muenstermann*, 787 F. Supp. at 527; *see also Ford* v. *United States*, 165 F. Supp. 3d 400, 431 (D. Md. 2016). Under Maryland law, "the permanency of [ ] injuries is an acceptable basis for awarding nonpecuniary damages." *Muenstermann*, 787 F. Supp. at 527.

By statute Maryland limits the amount of noneconomic damages in a personal injury action. "In any action for damages for personal injury . . . in which the cause of action arises on or after October 1, 1995, an award for damages may not exceed $500,000." *Johnson* v. *Singh*, Civil Action No. CCB-18-45, 2020 WL 4344923, at *3 (D. Md. July 29, 2020) (Copperthite, J.), *report and recommendation adopted*, 2020 WL 5626991 (D. Md. Aug. 17, 2020) (citing Md. Code Ann., Cts. & Jud. Proc. § 11-108(b)(2)(i)). The relevant statute further provides that the "limitation on noneconomic damages . . . shall increase by $15,000 on October 1 of each year beginning on October 1, 1995." Md. Code Ann., Cts. & Jud. Proc. § 11-108(b)(2)(ii). Here, because the date of the occurrence was July 29, 2020, noneconomic damages in this case are capped at $860,000.

Ms. Baylor did not request a specific amount of noneconomic damages at the evidentiary hearing or in her filings. ECF Nos. 75, 77, 79. Instead, Ms. Baylor seeks "an award of non-economic damages as determined by this Court." ECF No. 79 at 3. In support of this award, Ms. Baylor notes that as a result of the occurrence she "has been diagnosed with[ ] and continues to suffer from a chronic incurable medical condition." *Id.* This condition, which has a host of physical ramifications, affects her daily functioning and ability to engage in life activities and support herself and her family. *Id.* The evidence established that as a result of the occurrence Ms. Baylor has Chronic Regional Pain Syndrome, which Dr. Gurman described as "a very rare and complicated condition" that occurs when the "sympathetic nervous system goes haywire." ECF No. 75-5 at 96–97. It is evident from the record in this case that this chronic condition has detrimentally affected Ms. Baylor in many ways, negatively impacting her mobility inside and outside of the home, her physical comfort, her ability to engage in household responsibilities, and the range of employment options. *See supra* I.B.2 and 4. Ms. Baylor credibly testified regarding the impact of this condition on her life, describing how she went from being an active,

engaged person to someone whose every day is "miserable." *See supra* I.B.4.  In addition to intermittent, unpredictable physical pain, Ms. Baylor is also less able to engage in a range of life and household activities.

Due to the combination of effects the occurrence has had on Ms. Baylor, I recommend that the Court award her $500,000 in noneconomic damages.  This amount is consistent with what this Court has awarded other plaintiffs with similar injuries in the default judgment context. *E.g.*, *Ford*, 165 F. Supp. 3d at 431 (awarding $500,000 to compensate plaintiff for pain and suffering experienced during a grand mal seizure; her subsequent struggle to obtain normalcy due to headaches, twitching, and lethargy; and the emotional strain of being unable to care for her newborn daughter).  Other decisions of this Court have awarded lesser amounts of noneconomic damages for chronic injuries, but in those cases the injuries appear to have had a more circumscribed impact on the plaintiffs.  *E.g.*, *Johnson*, 2020 WL 4344923, at *2-3 (awarding $350,000 to a plaintiff with a permanent right ankle injury and $250,000 to a plaintiff with a permanent lumbosacral sprain); *Vasquez-Padilla* v. *Medco Props., LLC*, Civil Action No. PX 16-3740, 2018 WL 2462920, at *2 (D. Md. June 1, 2018) (awarding $100,000 to a plaintiff whose left leg would never return to full strength and would likely continue to experience stiffness in his knee while playing with his daughter and working).

### F.    Joint Tortfeasors

Finally, the Court must address the issue of joint tortfeasors.  In Maryland, the "right of contribution among joint tortfeasors is statutory."  *American Home Assur. Co.* v. *SUI Enter. Co.*, Civil Action No. PWG-12-817, 2014 WL 1793127, at *5 (D. Md. May 5, 2014); Md. Code Ann., Cts. & Jud. Proc. § 3-1402(a).  The purpose of the Maryland Uniform Contribution Among Joint Tort-Feasors Act (the Act), Md. Code Ann., Cts. & Jud. Proc. § 3-1401 *et seq.*, "is to prevent double recovery."  *Hollingsworth & Vose Co.* v. *Connor*, 136 Md. App. 91, 139 (2000).  The Act

defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."  Md. Code Ann., Cts. & Jud. Proc. § 3-1401(c).  "[I]n the absence of adjudication, . . . a party will be considered a joint tortfeasor when it admits joint tortfeasor status in a settlement agreement or if a default judgment has been entered against a party."  *Hollingsworth & Vose Co.*, 136 Md. App. at 139-140 (internal citation omitted).

Here, Ms. Baylor entered into a settlement agreement with Defendants Nathaniel Way and Eagle Rock that provides that all damages recoverable in this action by Ms. Baylor against anyone other than these two defendants will be reduced by the amount of consideration paid for the settlement and release or by the statutory pro rata shares of Nathaniel Way and Eagle Rock, whichever is greater.  ECF No. 80 at 4.  This provision is consistent with the Act, which provides, in pertinent part, that "[a] release by the injured person of one joint tort-feasor . . . reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid."  Md. Code Ann., Cts. & Jud. Proc. § 3-1404. The total amount of recommended damages exceeds the amount of consideration Nathaniel Way and Eagle Rock paid for settlement and release of Ms. Baylor's claims.  The question then becomes what are the statutory pro rata shares of Nathaniel Way and Eagle Rock.  Although not defined in the Act, Maryland courts have held that "'[p]ro rata' anticipates equal shares that are determined by dividing the common liability by the number of joint tort-feasors."  *Mercy Med. Ctr.* v. *Julian*, 429 Md. 348, 357 (2012); *see also Lahocki* v. *Contee Sand & Gravel Co.*, 41 Md. App. 579, 621 (1979), *rev'd on other grounds sub nom.*, 286 Md. 714 (1980) ("[W]e now hold that the term 'pro rata share' . . . mean[s] . . . in numerical shares or proportions based on the number of tortfeasors.").  Here, because there are three tortfeasors, the pro rata shares of

Nathaniel Way and Eagle Rock total two-thirds or 67 percent.  I recommend that the total

damage award be reduced accordingly.

**IV.     CONCLUSION**

      Based on the foregoing, I respectfully recommend that the Court award a total of

$347,372.59 in damages to Ms. Baylor against Beacon Pointe.  The constituent parts of the

recommended damage award are as follows:

| | |
|---|---|
| Past Medical Expenses: | $18,554.20 |
| Future Medical Expenses: | $505,180.00 |
| Past Lost Wages: | $28,910.00 |
| Future Lost Earnings: | $0 |
| Noneconomic Damages: | $500,000.00 |
| Subtotal: | $1,052,644.20 |
| Joint Tortfeasor Reduction: | -$705,271.61 |
| **Total:** | **$347,372.59** |

      The Clerk is directed to mail a copy of this Report and Recommendation to Defendant

Beacon Pointe.  Any objections to this Report and Recommendation must be served and filed

within fourteen (14) days, pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5.b.


Date:  February 11, 2025                                     _____/s/_____
                                                            Erin Aslan
                                                            United States Magistrate Judge